## THE STATE v. JOHN G. A. H. ZEHNDER, Appellant.

Division Two, May 26, 1910.

1. **FALSE MARKING OF HOGS: Grand Larceny: Value.** The statute (Sec. 1903, R. S. 1899) which declares that "if any person mark or brand or alter the mark or brand of any animal, the subject of larceny, being the property of another, with the intent to steal or convert the same to his own use . . . he shall be adjudged guilty of larceny, and punished in the same manner as if he had feloniously stolen such animal," is not directed solely against the marking of such hogs as are *per se* the subject of grand larceny. The statute no longer makes it grand larceny to steal or carry away hogs, in total disregard of their value, but the amendment of 1879 did not make the statute apply only to wrongful marking of hogs the stealing of which is grand larceny *per se*. Said section 1903 denounces the wrongful marking of any and all hogs, the property of another, with intent, etc., whatever may be their value.

2. ————: **Grand Larceny: Defined by Word "Feloniously."** Whatever may be the value of the hogs, the property of another, the false marking of them with intent to convert them to the marker's use, is grand larceny. That is the meaning of the

words of the statute which says that the offender shall be "punished in the same manner as if he had feloniously stolen such animal." To be a felony the larceny must be grand larceny.

3. ———: Instruction: No Felonious Intent. An instruction which does not require the jury to find that the defendant placed his own mark upon the hogs of another, with the felonious intent to convert them to his own use, is error. So that an instruction telling the jury that "if you believe and find from the evidence that the defendant . . . did unlawfully place and affix his own marks . . . in and upon the ears of two hogs, the personal property of Andrew J. Hopkins and of some value, no matter how small, with intent on the part of him, the said John G. A. H. Zehnder, to unlawfully steal and convert the hogs to his own use, then you will find the defendant guilty of grand larceny . . . and assess his punishment at imprisonment in the penitentiary," is erroneous. The instruction should have required the jury to find that defendant feloniously placed his mark on the hogs, or that he placed his mark upon them with the felonious intent on his part to steal and convert them to his own use. And such omission, in a case where the evidence to establish defendant's guilt is far from satisfactory, is reversible error.

4. ———: Incompetent Evidence: Possession of Other Property. In a prosecution of defendant for placing his mark upon the hogs of another, with the felonious intent to convert them to his own use, testimony as to the possession by the defendant of the hogs of any person other than the prosecuting witness should be excluded, where defendant took up other persons' stock to prevent them from trespassing upon his fields.

Appeal from Butler Circuit Court.—*Hon. J. C. Sheppard,* Judge.

REVERSED AND REMANDED.

*E. R. Lentz* for appellant.

(1) The indictment in this case is fatally defective, in that it fails to allege that the alleged marking of the hogs was done without the owner's consent. The statute makes the marking or branding of animals with intent, etc., a species of larceny. In every case of larceny the want of consent of the owner of

property alleged to have been stolen is an essential element of the offense. It is a fact which is an essential element in a prima-facie case of guilt and must be stated; nothing is to be left to intendment. All that is necessary to be proved must be alleged. Bishop on Crim. Prac. (3 Ed.), sec. 519; State v. Terry, 109 Mo. 619; State v. Benson, 110 Mo. 30; State v. Kirby, 115 Mo. 447; State v. Stowe, 132 Mo. 206; State v. Krueger, 134 Mo. 273; State v. Woodward, 156 Mo. 147. (2) In this case the defendant was indicted for one offense, i. e., that of marking two hogs with intent to convert to his own use, etc., and the instructions of the court directed the jury to find him guilty of another and different offense, to-wit, grand larceny. A man cannot be indicted for one offense and convicted of another, if the provisions of section 22 of our Bill of Rights are to be obeyed respecting the nature and cause of the accusation. Sherwood's Com. Crim. Law, p. 228; State v. Arter, 65 Mo. 654; State v. Stone, 68 Mo. 104; State v. Gabriel, 88 Mo. 642; State v. Harmon, 106 Mo. 650. (3) Where the defendant claims to own the property alleged to have been stolen, and there is no substantial evidence of any criminal intent, the court should not send the case to the jury. In this case the defendant claimed his wife owned the hogs; there was no evidence, either substantial or otherwise, of any criminal intent, hence the court erred in overruling the demurrer to the testimony requested at the close of all the evidence. State v. Cloybaugh, 122 S. W. (Mo. App.) 319; State v. Mathews, 20 Mo. 57. (a) The question in such cases is not as to the effect of the act done, but as to the animus which prompted its commission. State v. Pitt, 58 Mo. 558; State v. Johns, 124 Mo. 385; State v. Riley, 4 Mo. App. 397; State v. Cunningham, 154 Mo. 179. (b) The taking of property of another under fair color of right or title is not larceny. Witt v. State, 9 Mo. 671; State v. Homes, 17 Mo. 379; State v. Shermer, 55 Mo. 83;

State v. Weatherman, 202 Mo. 16; State v. Walker, 174 Mo. 523. (4) Section 1903, R. S. 1899, evidently refers to cases where the animal is killed, or as here, marked, before there is any taking or asportation, and not to cases where, as here, the taking or asportation was complete before the killing or marking takes place. Here the evidence shows that the hogs were first taken and confined at least two weeks before they were marked. Hence defendant could not have been convicted under this section, and the court should have so instructed the jury and directed a verdict for the defendant. State v. Crow, 17 S. W. 748. (a) The testimony in this case shows that if the defendant was guilty of any offense, he was guilty of petit larceny and could not be convicted under the indictment in this case. (b) The *animus quo* and all actions and words by which that is demonstrated form a part of the *res gestae*. Garber v. State, 4 Coldw. 161. (c) In this case the statement of the defendant at the time of taking up and marking the hogs, "that he thought they were his wife's hogs," is explanatory of, and gives color to, his acts in taking up and marking the hogs, and shows that he had no criminal intent at the time of the commission of these acts. State v. Gabriel, 88 Mo. 639. (5) From the revision of the statute in 1879, until the passage and taking effect of the Act of 1909, stealing a hog was not grand larceny unless it was of the value of thirty dollars or more. Respondent's instruction asked the court so to declare the law. All the evidence shows the value to be less than thirty dollars. Hence the refusal to give this instruction was error, as was, also, giving the first instruction for the State. R. S. 1899, sec. 1898. (6) The first instruction given on behalf of the State is erroneous in many respects. First. It omits the essential element of felonious intent by the defendant to feloniously convert the property to his own use. This court has always held that an instruction in a larceny case, which omits this

element, is erroneous. State v. Weatherman, 202 Mo.
10; State v. Speritus, 191 Mo. 24; State v. Littrell, 170
Mo. 15; State v. Rutherford, 152 Mo. 124; State v.
Lackland, 136 Mo. 30; State v. Moore, 101 Mo. 516;
State v. Ware, 62 Mo. 602; State v. Shermer, 55 Mo.
83; State v. Gray, 37 Mo. 463; Witt v. State, 9 Mo. 671.
Second. This instruction also fails to tell the jury that
the taking from the owner must be without consent.
This was absolutely necessary to complete the offense.
Unless it was taken without the consent of the owner.
it is not larceny. State v. Weatherman, 202 Mo. 10;
State v. Speritus, 191 Mo. 36; State v. Waller, 174 Mo.
522. Third. By this instruction the court tells the
jury that the stealing or marking of a hog of any value
whatever, no matter how small, is grand larceny. This
is not the law, or at least was not when this offense
was alleged to have been committed. R. S. 1899, sec.
1898. (7) Criminal statutes should not be extended
or enlarged by judicial construction so as to embrace
offenses or persons not plainly within their term. To
make the defendant guilty of grand larceny in this case
requires a most violent enlargement, by judicial con-
struction, of section 1903, upon which this prosecution
is based. State v. Howard, 137 Mo. 297; State v.
Gretzner, 134 Mo. 527; State v. Schuchmann, 133 Mo.
123; State v. Reid, 125 Mo. 48; State v. Bryant, 90
Mo. 537; Bishop on Stat. Crimes (2 Ed.), 196-227;
Sedgwick, Constr. of Stat. and Const. Law, sec. 280.
(a). A penal statute is not to be regarded as including
anything which is not clearly and intelligently de-
scribed in its very words, as well as manifestly in-
tended by the Legislature. Dudley v. Tel. Co., 54 Mo.
App. 391; Guaranty Co. v. Kansas City, 200 Mo. 168.
(b). Criminal statutes should be strictly construed
against the State, and liberally construed in favor of
innocence and liberty. State v. Rutherford, 152 Mo.
131; State v. McCance, 110 Mo. 398; State v. Gray, 37
Mo. 463.

State v. Zehnder.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Assistant Attorney-General, for the State.

(1) The offense of marking another's hogs with intent to steal or convert the same to such person's own use is purely a statutory crime, and when the statute individuates such crime the offender has proper notice of the nature of the charge against him, and it is sufficient to charge the offense in the language of the statute or in terms substantially equivalent. The indictment here follows the language of the statute and individuates the crime charged and fully informs appellant of the same. The indictment follows the approved forms as given by Kelley and Sherwood and is sufficient in every particular. Kelley's Crim. Law (2 Ed.), sec. 671; Sherwood's Law, p. 229; Joyce on Indictments, secs. 371 *et seq.*; State v. Edgen, 181 Mo. 589; State v. Miller, 190 Mo. 449; State v. Wilkerson, 170 Mo. 184; State v. Krueger, 134 Mo. 274; State v. Davis, 70 Mo. 467; State v. Kesslering, 12 Mo. 565; Parks v. State, 159 Ind. 211; State v. Runzi, 105 Mo. App. 319; Commonwealth v. Campbell, 22 Pa. Sup. Ct. 98; Whitlock v. Commonwealth, 89 Va. 337; Antle v. State, 6 Tex. App. 202; State v. Edmunds, 127 Ia. 333, 30 Cyc. 365; Bishop's Forms (2 Ed.), sec. 999. (2) Section 1903 makes it a felony for any person to mark an animal belonging to another, which animal is the subject of larceny, with the intent to steal or convert the same to his own use. The statute further provides that such person for such offense "shall be adjudged guilty of larceny and punished in the same manner as if he had feloniously stolen said animal." To adjudge a person guilty of larceny means the same as that the offense is the offense of larceny, and to say that he shall be punished in the same manner as if he had feloniously stolen said animal, means that he shall be punished as for grand larceny. The word "feloniously" as used in the criminal code means that the offense is a felony. R. S. 1899, sec. 2393; Bishop on Stat.

Crimes (2 Ed.), sec. 454. The very acts charged in the indictment are made actual larceny by the statute. (3) The correctness of the abstract proposition of law as stated by appellant in his third assignment of error, no one disputes. But learned counsel for appellant overlooks the strong evidence and facts in proof in this cause showing that appellant marked the hogs with the intent to steal and convert them to his own use. The fact that appellant told the prosecuting witness when he came for the hogs: "He said he had some there, and if they were mine, I could have them, they were not his," clearly shows that appellant did not believe the hogs belonged to his wife as he testified in the trial of this cause. The further fact that appellant hid the hogs away in the small pen after he had marked them, shows beyond doubt that he was trying to hide his crime of theft. While the hogs were in this small enclosed pen, and hid away from the view of those passing, the prosecuting witness made inquiry of appellant if he had seen the hogs, to which appellant replied that he had not, although he had informed the prosecuting witness that he knew his hogs. The proof in this case bristles with "ear-marks" of appellant's guilt. By instructions 2 and 3, given on behalf of the State, the court submitted the question of intent and ownership by the wife to the jury and told them they should acquit appellant if he marked the hogs believing them to be the property of his wife. There was much substantial evidence showing criminal intent on the part of appellant in marking the hogs. The court very properly submitted the question of intent to the jury and they found against appellant's contention. (4) Appellant further contends that section 1903, R. S. 1899, under which he was prosecuted and convicted, applies to cases where the animal is marked before there is any asportation. No one disputes the same to be the law, but appellant again loses sight of the facts and circumstances in proof in this case.

It was a question of fact for the jury to determine just when appellant formed the intent and took possession of the hogs with the intent to steal and convert them to his own use. The proof shows that the hogs came up two or three times before they were finally put in the field with other hogs. At the time appellant marked the hogs, he separated them from the other hogs in the field, and concealed them away in a small closed pen. This is when he evidently formed the intent to steal and convert them to his own use. (5) The first instruction given on the part of the State is correct. It follows the language of the indictment and statute under which it is drawn and includes all of the elements of the crime charged. (a) The words "with the intent to unlawfully steal and convert said hogs to his own use" sufficiently charge the felonious intent. This is not a common law larceny case as is argued by appellant's counsel, but is a case founded purely on the statute. The elements of larceny are made up by the common law. The elements of this offense for which appellant was prosecuted are made up by the statute. The felonious intent was sufficiently charged in the language of the statute. (b) The words "to unlawfully steal and convert to his own use" sufficiently charge that the taking was without the consent of the owner. Nothing could be stolen by consent of the owner, for if the owner gave his consent, it could not be larceny. (c) The marking of a hog of any value whatever, with the intent to steal or convert the same, or any part thereof, is grand larceny, irrespective of the value.

GANTT, P. J.—On January 26, 1909, the grand jury of Butler county returned an indictment against the defendant, in two counts. The first count charged that the defendant did, on or about the first day of October, 1908, at the county of Butler, State of Missouri, in and upon the ears of two hogs, all of the

value of thirty-five dollars, the personal property of one Andrew J. Hopkins, then and there being, feloniously place and affix his own marks, to-wit, a crop-off of each ear and a split in the right ear, with intent on the part of him, the said John G. A. H. Zehnder, then and there feloniously to steal and convert the said two hogs aforesaid to his own use. The second count charged the defendant with grand larceny of the said hogs on the said day. At the close of the testimony the State entered a *nolle* as to the second count of said indictment. The defendant was tried by a jury and found guilty on the first count and his punishment assessed at two years in the penitentiary. After an unsuccessful motion for a new trial and in arrest of judgment the defendant was sentenced and from that sentence has appealed to this court.

On the part of the State the evidence tended to show that the prosecuting witness, Hopkins, and the defendant lived within a quarter of a mile of each other and near to the city of Poplar Bluff in Butler county at the date of the alleged marking of the two hogs described in the indictment. Hopkins testified that he bought the two hogs from a man by the name of Rogers. He agreed to pay him five dollars for the two. When he got possession of the hogs they were on Coffman's place, and Rogers helped him get them up. The proof was very indefinite as to when Hopkins bought the hogs from Rogers, but it was a short time before G. D. Coffman claimed them, which was in the fall of 1907. It appears from the evidence that as a matter of fact Hopkins never paid Frank Rogers anything for the hogs, and Rogers testified that he never claimed the hogs and never sold them to Hopkins; that the hogs were running around on Coffman's place and Hopkins requested him to help him get them up and he did so. There was evidence that Hopkins had said the hogs were strays.

After the prosecuting witness Hopkins had taken

the hogs to his home G. D. Coffman claimed them. The prosecuting witness refused to give them up to Coffman when the latter laid claim to them, and thereupon Coffman brought a replevin suit before the justice, and after the writ was served the prosecuting witness agreed to and did pay all the costs of the replevin suit and bought the hogs from Coffman. There was much testimony on both sides indicating that these hogs had run at large in the woods in the neighborhood in which the prosecuting witness Hopkins, Coffman and the defendant lived. The prosecuting witness claimed that the hogs strayed away from his home on the 9th of June, 1908, and he made search for them in vain. He testified that along in the fall of that year he was traveling along the road adjoining the defendant's premises, and saw these two hogs lying in the defendant's hog lot; he called them and they came to him and he knew they were his hogs. He discovered, however, that *more* of their tails had been cut off, but he saw that they were his hogs.

He then gave the following description of the identification of his hogs by others and what occurred at the defendant's home: "I got G. D. Coffman to come and identify them. I got Mr. Otto Witte also to come. They both said they would swear they were my hogs. That was Saturday evening, and Monday morning I went up to get my hogs and see if Zehnder would give up my hogs. In the meantime I heard Mr. Wical had one gone, so Mr. Wical came over Monday morning to go up there and see if that was his hog, I and Mr. Wical and Mr. T. B. Hilton and Otto Witte went up there, and when I got there Mr Zehnder had just fed the hogs and had started out with two buckets of water. I made inquiry of the hogs, described them. He said he had some there and if they were mine I could have them, they were not his. He took us through the gate to where the hogs were and Wical said, 'That's mine,' and I said, 'These two over there are mine.' I

made inquiry of Zehnder how he came to get them, and he said they got into his field and he put them up, and I asked him if he did not know my hogs. He said no, that he was mistaken that time (referring to a previous conversation in which the defendant had told him that he had seen his hogs and knew them and if he saw them again would let him know) he described those hogs to me, that he did not know them. He said he had made inquiry of nearly everybody to find out about those hogs, but he did not make inquiry of me. I told him they were mine. He said if they were mine I could have them, they were not his.''

With the assistance of the men who went with him the prosecuting witness took the hogs out of the enclosure of the defendant and turned them out again. These hogs were of the black Poland-China stock, with a few white marks over them, a very few. One was more white than the other. There was practically no dispute as to the defendant marking the hogs with his mark.

The defendant testified in his own behalf that he marked the hogs, but at the time he did so he believed that they belonged to his wife and he was still of that opinion. His wife also testified that she thought the hogs in dispute belonged to her at the time they were marked. She stated that some two or more years prior thereto she had some small pigs that strayed away, and afterwards these two hogs came up with her husband's hogs, and came into his enclosure, and that she called them and they came to her, and that after they had come back several times with her husband's hogs they put them in the hog pasture, and later on her husband marked them with his mark. The defendant also offered evidence tending to prove his reputation as a law-abiding citizen in the community was good. Several of the witnesses on behalf of the State also testified that his reputation as a law-abiding man was good.

On the part of the State there was some evidence

tending to show that after this dispute came up the defendant's reputation as a law-abiding man was not good. Coffman testified that prior to the time he sold these hogs to the prosecuting witness, Hopkins, they had been running in the woods south of the Nickey farm and between that and Poplar Bluff.

George Purdam and Ed Purdam testified that they knew Coffman and knew the hogs in controversy, that they had seen them in defendant's field, and that at a time sometime before Coffman sold them to Hopkins these witnesses were cutting wood down in the Nickey field, and Coffman rode up to the outside of the fence and the hogs were there on the outside of the fence, and they asked Coffman whose hogs they were, and he looked at them and said: "They are my stock of hogs, but they are not mine, I do not know whose they are."

There was a direct contradiction between the prosecuting witness Hopkins and the defendant as to the alleged statement by the defendant that the hogs were not his, that if they were Hopkins' he could have them. Wical who was present at the time of the alleged statement put it in this way, that defendant said: "If we thought that they were our hogs to take them along, he did not want anybody's hogs, only his own. I understood that he had marked them through mistake." In regard to Wical's hog, there was no controversy, as the defendant said he had simply put it up to keep it out of his field. Witte did not testify to the statement attributed to the defendant by Hopkins, neither did Mr. Hilton.

Other witnesses testified to the fact that the defendant had hogs running outside, some marked and some unmarked, and that these two hogs in controversy came up with the defendant's hogs and would come in and go out of his hog pasture, and that defendant said the hogs were his and marked in his mark. These

228 Sup—21

witnesses also testified that the hogs in controversy were just like the stock of hogs that the defendant had on his premises. There was testimony that the prosecuting witness stated that when he bought these hogs from Frank Rogers he knew at the time they were strays, but that he had paid Coffman for them and had possession now and knew whom they belonged to.

As to the value of the hogs the prosecuting witness testified that for stock hogs the two were reasonably worth thirty-five dollars. He did not know what the market value was. They were worth twenty dollars to take them up and sell them. Coffman testified that the two were worth fifteen or twenty dollars, that was about what they were worth on the market. The defendant testified that he was in the butcher business and knew the value of the hogs and the two together would weigh about three hundred pounds and the hogs were worth four cents per pound on foot, that the two were worth about twelve dollars.

At the close of all the testimony the defendant requested the court to instruct the jury that under the pleadings and the testimony in the case defendant could not be convicted of the offense charged, and their verdict must be for the defendant. The defendant also requested the court to instruct the jury that, before they could find the defendant guilty of grand larceny they must believe from the testimony and beyond a reasonable doubt, the hogs alleged to have been appropriated to his own use by the defendant were of the value of thirty dollars or more. The court refused these two instructions and the defendant duly excepted. The court then, on the part of the State, gave the following instruction:

"The court instructs the jury that if you believe and find from the evidence in this case that the defendant at the county of Butler, State of Missouri, at any time within three years prior to the 26th day of January, 1909, did unlawfully place and

affix his own marks, to-wit, a crop-off of each ear and a split in the right ear, in and upon the ears of two hogs, the personal property of Andrew J. Hopkins and of some value, no matter how small, with intent on the part of him, the said John G. A. H. Zehnder, to unlawfully steal and convert the said hogs to his own use, then you will find the defendant guilty of grand larceny as charged in the first count of the indictment and assess his punishment at imprisonment in the penitentiary for a term of not less than two nor more than five years.''

To the giving of this instruction the defendant duly excepted at the time.

I.   The prosecution in this case is bottomed upon section 1903, Revised Statutes 1899, which provides: ''If any person mark or brand or alter the mark or brand of any animal, the subject of larceny, being the property of another, with intent to steal or convert the same to his own use, or shall willfully kill such animal, with intent to steal or convert to his own use the carcass or skin or any part of the animal so killed, he shall be adjudged guilty of larceny, and punished in the same manner as if he had feloniously stolen such animal.''   This section has been a part of the statute law of this State since 1835.   [R. S. 1835, art. 3, sec. 35, p. 178; R. S. 1845, ch. 47, sec. 38, p. 360; R. S. 1855, ch. 50, sec. 34, p. 577; R. S. 1865, ch. 201, sec. 30, p. 785.]

Prior to the revision of 1879 grand larceny was the felonious stealing, taking and carrying away money, goods, rights in action, or other personal property or valuable thing of the value of ten dollars, or more, or any horse, mare, gelding, colt, filly, ass, mule, neat cattle, sheep or *hog,* belonging to another; but by that revision, the act was amended by striking out the words ''*sheep and hog,*'' and by increasing the value of the stolen property to thirty dollars. [R. S. 1879, sec. 1307, p. 229.]   Since that revision it has remained as it

appears in section 1903 up to the time of the finding of the indictment in this case.

It is earnestly insisted by the learned counsel for defendant that section 1903 was directed against the marking and branding or altering the brand or mark of such animals and *such only* as were *per se* the subject of grand larceny, and as hogs, since the amendment of 1879 and up to 1899, were not such animals, unless they are of the value of thirty dollars or more, this section could not and does not apply to the branding or marking of hogs under the value of thirty dollars. The argument is more plausible than sound. Section 1903, from its original enactment in 1835, has at all times made it a felony for "any person to mark or brand or alter the mark or brand of *any animal, the subject of larceny,* the property of another, with intent to steal or convert the same to his own use," etc. It will be observed the statute does not limit the offense to the felonious marking or branding of any animal, the *subject of grand larceny,* but merely, the *subject of larceny,* and by its terms is comprehensive enough to include *petit larceny,* which is only another degree of larceny. The accidental fact that for years larceny of a hog, of whatever value, was grand larceny, and the felonious marking or altering of the mark of a hog with intent to steal was punishable as grand larceny, without reference to its value, does not justify us in holding that the amendment of the statute by excluding "hog or sheep" from the list of animals, the stealing of which constitutes grand larceny, *per se,* necessarily or by implication, amended section 1903 so as to make it apply *only* to animals the stealing of which is grand larceny *per se.* It applied when enacted to *any animal* which *was the subject of larceny,* and it still applied to such an animal when this offense was committed, if at all, and a hog was the subject of *petit larceny* at the time, and by so construing the section we are not extending it beyond its language or the intention of

the law-making power.  The Legislature has through-
out the history of the State regarded it of importance
to protect the rights of owners of live stock against
the offense of false branding or marking and changing
their marks or brands.  The act had its origin doubt-
less in the conditions which obtained at that date, when
the owners of stock turned them upon the rich and
succulent prairies in the spring, and only salted them
occasionally and gathered them in the fall.  The nat-
ural and rapid change in the size and appearance of
the animal often rendered it difficult, in the absence
of a brand or mark, to identify one's cattle or hogs,
and the ease with which a brand or mark could be
changed and thus destroy the evidence of ownership
in many cases, doubtless caused the enactment of this
act against the changing marks or brands, and it has
never been restricted at any period of our history to
animals the stealing of which has been grand larceny
*per se,* without regard to value.

II.   The defendant earnestly challenges the in-
struction given at the instance of the State on two
grounds.  First, that it directs the jury to find the de-
fendant guilty of grand larceny, and second because it
does not require the jury to find that the defendant
marked the hogs with a felonious intent to convert them
to his own use.

As to the first proposition Mr. Bishop in his work
on Statutory Crimes (3 Ed.), section 454, says:  "If a
man effaces from another's cattle the mark, or alters it,
or puts on them his own mark, intending by the help
of these devices to convert them to his own use, evi-
dently, as a question of just legal principle, though
the author does not call to mind any case directly to
the point, he commits either actual or attempted lar-
ceny at the common law;" and it was competent for
the Legislature, we think, to define such conduct as
larceny and to require it to be punished as grand lar-

ceny, as it has done, by requiring it to be "punished in the same manner as if he had feloniously stolen said animal," as petit larceny would be only a misdemeanor, and grand larceny a felony.

As to the second contention that this instruction eliminates the elements of felonious intent, there is much force in the point. The intent with which any person marks or brands an animal, the property of another, is of the very essence of the offense. The offense is a felony under the statute, and as was said in State v. Gabriel, 88 Mo. 642, "Where the indictment is based upon a statute creating the offense, an offense unknown to the common law, the indictment must set forth all the constituent facts and circumstances necessary to bring the accused perfectly within the statutory provision." The court in instructing the jury under this section should be careful to require them to find that the marking of the animal was with a felonious intent to steal the same, or should define those elements of larceny which are equivalent to a felonious intent. In this instruction the court did not require the jury to find that the defendant *feloniously* placed and affixed his own mark on the hogs of the prosecuting witness, nor that he had placed and affixed his marks to the hogs with the felonious intent on his part to steal and convert the same to his own use.

In State v. Matthews, 20 Mo. l. c. 57, it is said by this court: "It is the intention with which the act is done that gives to it its criminality." In that case, the defendant requested the court to charge that the jury could not convict the defendant unless they believe that he *willfully* altered the mark of the hog with intent to steal or convert the same to his own use, but the court refused said instruction and this court held that it committed error in refusing so to do.

In State v. Weatherman, 202 Mo. l. c. 9, the court instructed that grand larceny is a wrongful and fraudulent taking the property of another and converting the

same to his own use, and this court said: "That instruction two is erroneous is quite clear, as it omits the chief ingredient, that is, the *felonious* intent to convert the property to defendant's own use without the consent of the owner."

In State v. Gray, 37 Mo. 463, larceny is defined as "the wrongful or fraudulent taking and carrying away of the personal property of another from any place, with a *felonious* intent to convert the same to the taker's use and make it his own, without the consent of the owner." This definition has never been challenged but has been many times approved. [State v. Rutherford, 152 Mo. 124; State v. Littrell, 170 Mo. 13.]

Reasoning by analogy, it seems to us that the felonious intent is as much an essential element of this crime as it possibly could be in the definition of larceny; and as the learned circuit court neither required in words or any terms that the jury should find that the defendant marked the hogs with a *felonious* intent to steal the same, nor used other words tantamount to *felonious* intent, words which would have explained to the jury the felonious intent with which the act must have been done to constitute it a crime, we think the instruction is subject to the criticism made upon it. In view of the nature of the evidence in the case, we are of the opinion that the defendant was entitled to a clear and explicit declaration of the law in his behalf. The evidence is far from satisfactory to our minds to establish the guilt of the defendant. The sharp conflict as to ownership of the hogs on the part of the prosecuting witness himself, and the means by which he acquired his claim to the hogs, and the fact that the hogs had voluntarily come into the enclosure of the defendant, and the testimony on the part of the defendant's wife and of others as to the ownership by the defendant and his wife of hogs of a similar breed, has produced in our minds a grave doubt as to the correctness of the verdict in this case, and has constrained us in view

of the unsatisfactory instruction in the case to reverse the cause that a new trial may be had.

Inasmuch as the judgment must be reversed and the cause remanded, we may remark that all evidence as to the possession by the defendant of the property of any other person than the prosecuting witness in this case, should be excluded from the jury, and evidence as to the defendant taking up other people's stock should not be permitted, as this character of evidence evidently tended to prejudice the defendant's case in the eyes of the jury.

For the reasons given the judgment must be and is reversed and the cause remanded for new trial. All concur.